1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

EUREKA DIVISION

7

8

LANH H.,[1]

9

Plaintiff,

10

v.

11

KILOLO KIJAKAZI, et al.,

12

Defendants.

Case No.  23-cv-03727-RMI

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 13, 15

13

14        Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying his

15   application for disability benefits under Title II of the Social Security Act. *See* Admin. Rec. at 1.[2]

16   The Appeals Council of the Social Security Administration declined to review the ALJ's decision.

17   *Id.*  As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security,

18   appropriately reviewable by this court.  *See* 42 U.S.C. § 405(g), 1383(c)(3).  Both parties have

19   consented to the jurisdiction of a magistrate judge (Docs. 6, 8) and both parties have moved for

20   summary judgment (Docs. 13, 15).  For the reasons stated below, Plaintiff's Motion for Summary

21   Judgment is GRANTED and Defendant's Cross-Motion for Summary Judgment is DENIED.

22                                      **LEGAL STANDARDS**

23        The Social Security Act limits judicial review of the Commissioner's decisions to final

24   decisions made after a hearing.  42 U.S.C. § 405(g).  The Commissioner's findings "as to any fact,

25

26        [1] Pursuant to the recommendation of the Committee on Court Administration and Case
     Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

27

28        [2] The Administrative Record ("AR"), which is independently paginated, has been filed in
     12 attachments to Docket Entry #12.  *See* Docs. 12-1 through 12-12.

*United States District Court*
*Northern District of California*

if supported by substantial evidence, shall be conclusive." *Id.*  A district court has limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error.  *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997).  "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## BACKGROUND

Plaintiff is a thirty-nine-year-old man with a bachelor's degree in computer science and a minor in mathematics.  AR at 38–39.  With this education, he built a respectable career in the tech industry, serving as a helpdesk and logistics manager for Yelp before becoming a production services manager at another company, SMARSH INC, in 2018.  *Id.* at 42–43, 251.  In this position, Plaintiff earned an annual salary of $140,000 and was eligible for performance bonuses up to an annual total of $14,000.  *Id.* at 251.

Plaintiff's life began to unravel in 2019.  Before then, he had been diagnosed with insomnia and experienced some seizures, but neither condition interfered with his ability to work.  AR at 42, 547.  In January of 2019, however, he began experiencing "significant anxiety, difficulty sleeping, ongoing conflict with [his] fiancé, . . . depressed mood, anhedonia, low energy/concentration[]," and feeling of hopelessness.  AR at 361.  Plaintiff would later indicate that he was stressed "partly from [his] job" and that when stressed, he would be unable to sleep.  *Id.*  He also developed a fixation on his fiancée that impacted his work.  *Id.*

United States District Court
Northern District of California

On April 24, 2019, Plaintiff was involved in a car accident.  AR 335.  Medical records indicate that Plaintiff suffered no apparent injuries in the crash and did not think his head had been injured or that he had lost consciousness.  *Id.* at 337–38.  However, Plaintiff reports that after the crash, "I was not able to function as I normally did before.  My performance dropped significantly.  My interaction with people was barely there."  *Id.* at 42.  He later attributed part of this to difficulty remembering people and places.  *Id.* at 536.  As a result of Plaintiff's declining performance, SMARSH terminated his employment in late June of 2019.  *Id.* at 42, 350, 354, 361, 536.

In the days following his firing, Plaintiff displayed "significant depressive and anxiety symptoms" and an "extremely tangential" thought process during evaluations.  AR at 368.  He told one psychologist that he had been "up for 5 days tracking [his] fiance's every move" and found "comfort in tracking her.  It's an admitted obsession."  *Id.* at 351.  At the same visit, he noted that he "put things together that may not come together" when digging into his fiancee's activities.  *Id.* His primary-care provider prescribed him Lexapro for his worsening anxiety and advised him to see a mental health provider.  *Id.* at 548, 550.  While his anxiety was reported to have improved shortly after he began medication, by July 11, his anxiety was noted as "deteriorated."  *Id.* at 552–54.  On July 21, it was noted as "improved but still high."  *Id.* at 342.  At some point, Plaintiff was also prescribed the antidepressant trazodone.  *Id.* at 342.

While Plaintiff spoke to several mental health providers within weeks of being fired, he never established a treating relationship with any of them.  The first therapist he saw was unable to complete an assessment interview because Plaintiff "was in distress about getting fired from [his] job and was difficult to redirect."  AR at 366.  Shortly afterwards, Plaintiff told another doctor that he "did not connect well" with the first therapist and was "seeking out [a] new therapist he feels he can trust."  *Id.* at 361.  Another therapist noted Plaintiff as "seeing various [behavioral health] providers for one-shot counseling[,]" opining that he did "not appear to be psychiatrically or behaviorally stable and has yet to have a second therapy app[ointmen]t with a psychologist."  *Id.* at 353.  A few days later, a third therapist noted that Plaintiff "has been seeing various [behavioral health] providers in [the] past week" and that he had made another appointment to talk to yet

another provider, which Plaintiff attributed to his own "trust issues[.]"  *Id.* at 345.

Of all the psychologists Plaintiff spoke to, only Dr. Jennifer Kirkland had more than one visit with Plaintiff.  After the first visit, on July 9, 2019, she noted that Plaintiff "may be better served in an IOP or partial hospitalization setting."  AR at 353.  At a second visit with Dr. Kirkland three weeks later, Plaintiff reported poor self-care, the inability to sleep for days on end, "ongoing obsessive cyber tracking of fiancé and near global mistrust of others."  *Id.* at 371.  Dr. Kirkland opined that "[g]iven the severity of [symptoms] that have negative impact on [Plaintiff's] functioning with no improvement with start of medication, [Plaintiff] would be best served in the community where more comprehensive services are available."  *Id.*  The record does not reflect a third visit with Dr. Kirkland.

In the meantime, Plaintiff also began to complain of cognitive symptoms.  In the weeks after his firing, he reported low energy, lack of motivation, and difficulty concentrating to multiple providers.  AR at 345, 361, 368.  On July 11, 2019, Plaintiff complained of memory loss and was referred to a neurologist for evaluation.  *Id.* at 553.  The neurologist, Dr. Barry Mann, noted that Plaintiff lost one point in the "memory" category on a mini mental status examination.  *Id.* at 500.  Plaintiff complained to Dr. Mann of "[c]hronic anxious depression + insomnia, with increasing memory problems".  *Id.* at 501.  Dr. Mann described this as an "[i]diopathic cognitive impairment" that "could be due to insomnia + depression" and noted the "need to r[ule] o[ut] stroke/ms/hydrocephalus".  *Id.* at 500.  To that end, Dr. Mann ordered an MRI.  *Id.*  The MRI, taken on August 9, 2019, did not reveal any abnormal findings.  *Id.* at 407.

Dr. Mann continued to treat Plaintiff's cognitive conditions from that point forward.  In August of 2019, Dr. Mann gave a diagnosis of "Chronic anxious depression, cognitive decline" despite Plaintiff scoring a perfect 30 points on a mini mental status exam.  *Id.* at 498.  Plaintiff also reported a new symptom: "nocturnal shaking spells witnessed by fiancé".  *Id.*  These were not accompanied by daytime loss of consciousness or the tonic-clonic movements that characterize typical seizures; however, they did interfere with Plaintiff's ability to sleep.  Dr. Mann's notes show that he wondered whether Plaintiff's cognitive deficits were psychogenic, epileptic, or from some other cause.  *Id.*  Dr. Mann ordered an EEG in early September, the results from which were

United States District Court
Northern District of California

normal.  *Id.* at 430.  However, the results contained the following disclaimer: "Please note that a normal EEG may not exclude the possibility of a seizure disorder.  Clinical correlation is advised." *Id.* at 431.  Additionally, while Plaintiff's seizures were nocturnal and happened in bed, Plaintiff was not asleep during the EEG.  *Id.*

In October of 2019, Plaintiff reported 1 to 2 limb tremors per week interrupting his sleep. AR at 498.  After speaking to Plaintiff's fiancée, Dr. Mann determined the movements were tonic-clonic after all, but was still unsure whether the shaking spells were epileptic.  *Id.*  Nevertheless, he prescribed the anti-seizure drug Depakote.  At this time, Plaintiff scored 29 out of 30 points on a mini mental status exam, missing one point for attention.  Plaintiff also reported forgetfulness during the day: "loses keys, forgets where parked."  *Id.*

In early 2020, Plaintiff reported fatigue and mild disorientation in the morning and a daytime urge to nap most days; he often took an afternoon nap.  AR at 497.  The Depakote initially proved helpful at preventing prolonged tonic-clonic shaking spells while Plaintiff slept, but he still experienced nightly 10-second "tremor spells" when falling asleep.  *Id.*  By the latter half of the year, the longer shaking spells had returned at their previous frequency of once or twice per week, and Dr. Mann increased Plaintiff's Depakote dosage.  *Id.*  Dr. Mann also noted that Plaintiff's "[c]oncentration still feels poor" and that while Plaintiff was attempting to re-apply to college, he would forget to follow up on his applications.  Plaintiff continued to score 29 out of 30 on the mini mental status exams, generally losing a point in the "memory" category.  *Id.*

At the same time, a sleep test revealed that Plaintiff had sleep apnea, so he was prescribed a CPAP machine.  AR at 496.  However, Plaintiff experienced delays in receiving the machine. *Id.*  Dr. Mann prescribed trazodone to increase the quality of Plaintiff's sleep.  When the machine arrived, however, Plaintiff could not tolerate CPAP, and Dr. Mann referred him to a sleep specialist.  *Id.*  Plaintiff reported the following symptoms to the sleep specialist: "wakes unrefreshed", "drowsiness when driving", and "daytime sleepiness" necessitating "daily afternoon naps[.]"  *Id.* at 594.  The sleep specialist noted that the consequences of untreated sleep apnea "include excessive daytime sleepiness/fatigue [and] cognitive dysfunction[.]"  *Id.* at 597. However, a second sleep study conducted in late 2020 indicated that the apnea was not significant.

*Id.* at 603.  In the meantime, the humidification stopped working on Plaintiff's CPAP machine and he reported difficulty sleeping with it on.  *Id.* at 503, 506.

In August 2020, Plaintiff filed the instant application for Social Security benefits.  AR at 262.  In it, he complained of poor concentration and focus; lost, incorrect, or unreliable memories; seizures during sleep; stoppage of breath during sleep; and the inability to keep a normal sleep schedule or stay awake during the day.  *Id.* at 255–56.  He noted that he was often too exhausted to get out of bed, but at other times would suffer from restlessness.  *Id.* at 256.  He said he prepared meals weekly, specifically "cereal & milk or fruits or sandwich", and that this took him 30 to 60 minutes; he said that "[a]ll attempts to cook or heat food burned[.]"  *Id.* at 257.  He reported that his chores consisted of dishes (daily), laundry (monthly), and watering plants (5 days per week).  *Id.*  He said that he needed encouragement to do the laundry and water the plants and that he did not do more chores due to "Extreme Exhaustion or asleep due to medi[c]ation side effects[.]"  *Id.*  He said that he went outside only when necessary due to fatigue and did not drive due to a previous seizure while driving.  *Id.* at 258.  He said that he could shop for food and necessities, but that he would "always go in forgetting why I went and 30–60 minutes later remember what it was, at least once a week."  *Id.*  He said that "reading and watching TV seems like it[']s all new or déjà vu" and that "what I hear is not always what I heard or what is said does not always match what I wrote in my notes[.]"  *Id.* at 259.  However, he said that he could eat, shop for fruit, and walk with other people and patronize food banks, churches, and pharmacies.  *Id.*  He gave the upper limit of his attention span as 30 minutes, stating that he would "miss at least a step or two unintentionally", but said that he could follow spoken instructions "ok" if he heard them correctly.  *Id.* at 260.  He said that SMARSH fired him due to problems getting along with team leaders of other departments and requested that the SSA inquire for more details.  *Id.*  He said that he handled stress poorly due to his depression and anxiety and recounted fears ranging from the fairly rational (loss of housing and insurance, inability to work or go back to school) to the possibly irrational (people failing to accept him if they knew of his disability, dying alone and unmissed, dying suddenly in his sleep) to the paranoid (his teenage children not being his).  *Id.* at 261.  In closing, he reported that he had had to reopen the sealed envelope 8 times and had missed the final remarks

page 4 times while putting the application together.  *Id.* at 278.

In January of 2021, Plaintiff was evaluated by Dr. Aparna Dixit to determine whether he was eligible for state disability benefits.  AR at 514.  He reported that he had not had a seizure for several months, that he was still awaiting a replacement for his CPAP machine, and that he had problems with short-term retention and concentration.  *Id.*  He also reported "nervousness, restlessness, poor frustration tolerance, and feeling of helplessness."  *Id.*  However, he indicated that he was not receiving therapy or counseling.  *Id.* at 515.  He reported that he could do some household chores, "but only when he has better energy."  *Id.*  He said he could not go grocery shopping by himself, had not driven since the April 2019 crash (which he blamed on "medication-induced drowsiness"), and could only cook a few simple microwaved meals.  *Id.*  Dr. Dixit noted that Plaintiff's ability to give an account of his symptoms was hampered by "some limitations from his cognitive deficits[.]"  *Id.* at 514.  Indeed, Plaintiff was unable to complete the patient history form.  *Id.* at 515.

Dr. Dixit noted that Plaintiff appeared tired, was "remarkably anxious", gave one-word answers where elaboration would have been helpful, had a "disorganized and rambling" thought process which "require[d] frequent re-direction", and showed signs of "moderate psychomotor retardation[.]"  AR at 515.  However, Dr. Dixit noted no signs of a formal thought disorder, hallucinations, or delusions.  After conducting a battery of IQ and memory tests, Dr. Dixit assessed Plaintiff's working and short-term memory as "impaired" and noted that Plaintiff, who had earned a math minor, was "unable to perform most simple mathematical problems[.]"  *Id.*  Overall, Dr. Dixit observed "[m]oderate cognitive deficits . . . commensurate with a cognitive disability" and noted that this disability "adds to [Plaintiff's] dearth of coping skills[.]"  *Id.* at 517.  While Dr. Dixit believed that Plaintiff would have no difficulty remembering and following simple instructions, Dr. Dixit assessed plaintiff as being moderately impaired at retaining and following complex or detailed instructions, working with the public or other employees, and tasks requiring mental flexibility.  Further, Dr. Dixit assessed that Plaintiff was markedly impaired in his ability to maintain pace and persistence over 2-hour increments.  *Id.*

Also in early 2021, Plaintiff established care with a psychiatrist at the Schuman-Liles

Clinic.  AR at 612.  Plaintiff reported that his depression and anxiety symptoms prevented him from thinking and focusing and that he was "worried all [the] time," but that Lexapro helped the symptoms.  *Id.*  He also reported that he "hears things from tv, message in the background noise, here and there [for] 3 years" and that he "[h]ears voices sometimes."  He expressed interest in a neuropsychological evaluation to rule out ADHD.  *Id.*  However, over a month later, Dr. Mann's notes reflect "[i]nsurance problems preventing completing his cognitive evaluation."  *Id.* at 519.  While Plaintiff still reported that his activities of daily living were independent, he also reported that "he cannot do his usual job due to easy distractibility, fatigue and poor memory—cannot multi-task."  *Id.*  In addition, his CPAP machine remained uncomfortable and he believed he needed a new device.  Dr. Mann assessed Plaintiff as suffering from "idiopathic cognitive problems – likely combination of psychogenic and sleep apnea side effects.  Cannot rule out adult Attention Deficit Disorder or other type of early onset brain degenerative disease superimposed.  As we have been unable to get outp[atien]t NeuroPsych Testing authorized, I recommend we consult a university-level Memory Disorder Clinic[.]"  *Id.*

Roughly a month later, Plaintiff reported to his psychiatrist at Schuman-Liles that he had been kept up for three days straight by his depression and anxiety symptoms.  AR at 611.  Because his psychiatrist suspected Plaintiff was either bipolar or schizophrenic, Plaintiff was prescribed Risperdal, an anti-psychotic used to treat both conditions, and Seroquel, used to treat these disorders as well as major depression.  *Id.*  At the same time, Plaintiff's doses of Lexapro and Trazadone were being decreased.  *Id.*

On July 16, 2021, Plaintiff was driving when he either fell asleep at the wheel or experienced a seizure, causing a crash.  AR at 536, 557.  He was taken to the emergency room and underwent a CT scan, which showed no abnormal results.  *Id.* at 557.

In late July of 2021, Plaintiff obtained a neurological evaluation from Dr. Lisa Griffin.  AR at 535.  Plaintiff was accompanied during the evaluation by his former fiancée, whom he had married in the interim.  *Id.*  Dr. Griffin listed Plaintiff's "[c]hief complaints" as epilepsy, memory problems, hypertension, and sleep apnea.  *Id.*  Plaintiff reported that his shaking spells had decreased substantially with medication, although he said he still experienced 10-second shaking

spells before falling asleep.  *Id.* at 535–36.  He also reported that he often felt that his imagination was taking the place of real history and could not remember details well.  *Id.* at 537.  Plaintiff and his wife explained that Plaintiff's wife did the cooking and the general housework.  *Id.*  Plaintiff said that he slept during the day and was awake at night due to insomnia, and that he spent much of his time sleeping or staring at the ceiling, not wanting to bother anyone at night by doing significant activities.  *Id.*

Dr. Griffin conducted a mental status examination of Plaintiff, which was normal except for one memory exercise he was unable to complete.  AR at 539.  Based on the same exam, Dr. Griffin observed no inability to follow simple or complex instructions.  *Id.*  Dr. Griffin ultimately diagnosed Plaintiff with "[m]emory dysfunction," noting that he "had decent but not perfect memory on limited direct testing."  She also endorsed a diagnosis of "Probable nocturnal epilepsy", but wondered whether Plaintiff's seizures were really epileptic in nature based on a reenactment by his wife which did not look tonic-clonic.  *Id.*

In August 2021, Plaintiff reported to his psychiatrist at Schuman-Liles that he no longer heard voices, but that the medications were making him "very sleepy[.]"  AR at 611.  Accordingly, his Seroquel dosage was decreased.  *Id.*  A mental status exam at Schuman-Liles noted Plaintiff's concentration as being "[w]ithin normal limits."  *Id.* at 610.  Later that month, Plaintiff reported to Dr. Mann that he continued to suffer from concentration problems and was now experiencing morning headaches, so Dr. Mann prescribed venlafaxine to improve his energy and reduce his headaches.  *Id.* at 557.  Plaintiff also underwent a second EEG, which was normal, although Dr. Mann noted that Plaintiff was on Depakote.  *Id.*

Also in August 2021, the state disability adjudicators determined that Plaintiff was not disabled.  AR at 112.  The state adjudicators found that the "marked limitation" endorsed by Dr. Dixit was "not fully supported" because it was "without substantial evidence from [the] medical source who made it" and "an overestimate of the severity of the individual's restrictions/limitations," but did not elaborate further.  *Id.* at 72, 74–76, 83.  They also noted that Plaintiff's reported "symptoms and intensity of symptoms are not fully supported by objective evidence", again without elaborating.  *Id.* at 76.  Ultimately, they concluded that Plaintiff was

1   "able to sustain a work schedule with simple tasks" based on his activities of daily living; the

2   location, duration, frequency, and intensity of Plaintiff's pain and/or symptoms; precipitating and

3   aggravating factors; Plaintiff's medications; and Plaintiff's other treatment.  *Id.* at 102, 109.  The

4   examiners did not explain more precisely what about these factors persuaded them.  *See id.*

5        In mid-September 2021, Plaintiff saw Dr. Mann again.  AR at 557.  This time, Plaintiff

6   only scored 26 points out of 30 on the mini mental status examination, losing points for orientation

7   and attention; his previous score had been 27 out of 30.  *Id.*  Plaintiff reported that his CPAP

8   machine was not working and that he was having trouble contacting a sleep specialist.  He also

9   reported that the venlafaxine reduced his headache but did not help his fatigue or concentration

10  problems.  By this time, Plaintiff was no longer taking Lexapro, but he continued on Risperidone

11  and Trazodone and had been prescribed another insomnia drug, quetiapine.  Dr. Mann assessed

12  that Plaintiff's cognitive problems were "likely due to polypharmacy + depression + untreated

13  sleep apnea" and noted that "[h]opefully they can reduce the sedating meds[.]"  *Id.*

14       In February 2022, Plaintiff was able to consult sleep specialist Dr. Shehla Huseni.  AR at

15  579.  He told Dr. Huseni that he was "no longer using [his] cpap machine due to [a] recall."  *Id.*

16  Dr. Huseni planned to conduct a home sleep study on Plaintiff.  *Id.*  A month later, Plaintiff

17  complained to his primary care provider that he had gotten sleepier over the past 2 years, that he

18  was sleeping more but that the sleep was of poor quality, that his seizure condition persisted, and

19  that he continued to have memory issues.  *Id.* at 330.

20       In April 2022, Plaintiff attempted to undergo a psychological evaluation with Dr. Kristen

21  Wortman, but the testing was discontinued.  AR at 558.  Dr. Wortman's notes reflect that Plaintiff

22  "was unable to participate in [the] testing process" and "could not participate adequately."  *Id.* at

23  558–59.  Plaintiff testified that "I was not able to focus during the meeting.  I kept falling asleep.  I

24  kept waking myself up to conduct her evaluation but . . . she saw for herself that I was not able to

25  do it."  *Id.* at 52.  The evaluation was aborted one hour into the planned four-hour session.  *Id.* at

26  52–53.

27       In support of Plaintiff's Social Security benefits application, Dr. Mann completed a

28  questionnaire regarding Plaintiff's seizures.  Dr. Mann listed diagnoses of "[n]octurnal seizures,

10

probable sleep apnea not fully treated[, and] cognitive decline of uncertain cause" and noted that "sleep apnea, depression and medications for depression all contribute[.]"  AR at 560.  Dr. Mann stated that Plaintiff suffered an average of two seizures per week, which occurred during sleep and were mainly triggered by stress.  *Id.* at 560–61.  He further stated that Plaintiff suffered confusion and exhaustion for 1–2 hours post-seizure and was "more fatigued the next day[.]"  He said that Depakote provided "[p]ossibly better control of nocturnal spells, but now [Plaintiff] sleeps alone, so unsure."  *Id.* at 561.  Dr. Mann estimated that Plaintiff would miss work for 4 days per month due to seizures.  *Id.* at 563.  He also noted that "[s]leep apnea makes [Plaintiff] tired all day + impairs concentration.  Depression also causes these symptoms.  He is seeing a sleep specialist and a psychiatrist to deal with these issues." *Id.*  However, Dr. Mann noted that "[n]eurologic testing in office still shows good concentration in low stress environment[.]"  *Id.*

The most recent medical documents in the record date to May 19, 2022.  On that day, Plaintiff had an appointment with Dr. Huseni.  Plaintiff reported that he was not currently using his CPAP machine and could not tolerate it.  AR at 574.  Per Dr. Huseni: "He says he is very tired and sleepy all the time.  He says that one time . . . he fell asleep while laughing, fell to the floor while on the couch and went to sleep.  This was just last week."  *Id.*  Plaintiff reported that he had stopped taking his insomnia medication, quetiapine, because he had run out of it.  He also reported auditory hallucinations, "like the tv is on when it[‘]s not[.]"  Dr. Huseni assessed Plaintiff as suffering from mild sleep apnea with a "history of excessive daytime sleepiness and possible symptoms of narcolepsy including possible cataplexy . . . , auditory hallucinations, and sleep paralysis[.]"  Dr. Huseni also diagnosed hypersomnia.  Ultimately, Dr. Huseni determined that Plaintiff should undergo a sleep study and should discontinue his medications in order to get an accurate result.  *Id.*  Later that day, Dr. Mann agreed that Plaintiff could be safely tapered off Depakote for the study.  *Id.* at 565.  Further, Dr. Mann decided that in the absence of a witnessed seizure, Plaintiff should stay off Depakote until a sleep disorder was ruled out as the cause of Plaintiff's symptoms.  *Id.*

At the ALJ hearing, Plaintiff testified largely consistent with his Social Security application.  He reported that he had briefly tried to help his wife with her work by taking phone

calls and scheduling appointments, but only did that work for one day.  AR at 40.  The next day, he fell asleep and was unable to answer the calls.  *Id.*  He indicated that his seizures got worse beginning on April 24, 2019, the day of his first car accident, and that his work performance had deteriorated after that point.  *Id.* at 42.  He reported being "unable to control my sleep.  I'm still getting seizures.  And I'm mostly overwhelmed with headaches, and I'm unable to focus and remember the things that I'm supposed to do, and I require reminders and . . . I keep falling asleep at random times throughout the day.  I cannot control it."  *Id.* at 45.  He reported getting two or more seizures per week while he was asleep, but that because his sleep happened randomly throughout the day, so did the seizures.  *Id.*  He said that after seizures, it could take him up to an hour to get out of bed.  *Id.* at 46.  He also testified that he believed the seizures impacted his memory, stating that "most days I don't remember what's going on the whole day or the whole week.  I'm losing days in my life.  I don't know where they've gone."  *Id.*  He reported that he was still trying to get a CPAP machine that worked for him, but was unable to keep a CPAP mask on his face due to rolling over and sleepwalking.  *Id.* at 47.  Additionally, because he fell asleep at random, he would not always be able to put a CPAP mask on before falling asleep.  *Id.*  For this reason, he was concerned about Dr. Mann's theory that sleep apnea caused the seizures.  *Id.* at 51.  He said that he did not go anywhere on a regular basis, would at most take a four-block walk, and could not shop for groceries unless his wife accompanied him.  *Id.* at 49.  He testified that "I still have the same problems with . . . or without medications" but noted that he had "started having serious seizures again" while his seizure medication was reduced for the sleep study, which would take place after the ALJ hearing.  *Id.* at 54-55.

A vocational expert opined that Plaintiff was incapable of performing his past work.  AR at 57.  The ALJ posed the hypothetical of a person unable to drive commercially, climb ladders or scaffolds, or work at a strict production rate and who could only have limited exposure to hazards, follow simple instructions, have limited interactions with others, make simple work-related decisions, and tolerate occasional change in work location.  *Id.* at 57.  The vocational expert said that a person in this situation could work as a dishwasher, food service worker, or stock checker.  *Id.* at 58.  However, the vocational expert opined that such a person would not be able to find

1    work if they were off-task for 20 to 25 percent of the work day.  *Id.*

2                           **THE ALJ'S DECISION**

3             The ALJ engaged in the required five-step sequential evaluation process. AR at 17–26.  At

4    step one, the ALJ determined Plaintiff had not performed substantial gainful activity during the

5    relevant period.  *Id.* at 17.  At step two, the ALJ determined Plaintiff had the following severe

6    impairments: depression, anxiety, sleep apnea, and seizure disorder.  *Id.*  The ALJ noted that

7    Plaintiff had hypertension but found this impairment to be nonsevere.  *Id.* at 18.

8             At step three, the ALJ found that none of Plaintiff's conditions met or equaled any listed

9    impairment.  AR at 18.  Specifically, the ALJ found that the record evidence did not reflect the

10   type or frequency of Plaintiff's seizures in sufficient detail to qualify Plaintiff for Listing 11.02,

11   and that the seizures in the record were largely based off Plaintiff's own reports.  *Id.*  Further, the

12   ALJ found that Plaintiff had no "marked" limitations and that two "marked" limitations were

13   needed to qualify for Listings 12.04 and 12.06.  *Id.* at 18–19.  Based on Plaintiff's reported

14   activities, including "that he lived at home with family and he was able to walk, eat meals, and

15   shop with others," the ALJ characterized Plaintiff's limitations as "moderate."  *Id.*  The ALJ said

16   that these conclusions were supported by Plaintiff's "conservative course of treatment" and the

17   findings of the state disability examiners.  *Id.* at 19.

18            In formulating Plaintiff's residual functional capacity ("RFC"), the ALJ determined that

19   Plaintiff could perform medium work as defined in 20 C.F.R. § 404.1567(c).  AR at 19.  The ALJ

20   determined that Plaintiff could only occasionally be exposed to hazards, was unable to drive a

21   vehicle commercially, should only be tasked with following simple instructions, could only

22   occasionally interact with others, could only make simple decisions, could only tolerate occasional

23   changes in work location, could not work at a strict production rate pace, and was unable to climb.

24   *Id.*

25            In reaching this determination, while the ALJ determined that Plaintiff's "medically

26   determinable impairments could reasonably be expected to cause the alleged symptoms", the ALJ

27   dismissed Plaintiff's testimony about the intensity, persistence, and limiting effects of his

28   symptoms because she found the testimony inconsistent with the record evidence.  *Id.* at 20.

United States District Court
Northern District of California

Specifically, the ALJ cited the extent of Plaintiff's observed medical deficits, Plaintiff's "conservative" course of treatment, the extent of Plaintiff's daily activities (namely, "his ability to shop, walk with others, and do household chores with encouragement"), the fact that he collected unemployment after his alleged onset date, and a normal EEG result. *Id.* at 20–21.  While Plaintiff's treating neurologist, Dr. Mann, opined that Plaintiff's poor concentration would impact his ability to work and that Plaintiff would need to miss four days of work per month, the ALJ dismissed this opinion because Plaintiff's symptoms were caused in part by conditions which were managed with medication (specifically, seizures and depression) and the record showed that Plaintiff could remember and follow simple instructions.  *Id.* at 22–23.  And while Dr. Dixit, an examining psychologist, opined that Plaintiff had a marked limitation on maintaining pace and persistence for two hours, the ALJ dismissed this opinion as inconsistent with the state consultants' findings and Plaintiff's "conservative" course of treatment.  *Id.* at 23–24.

At step four, the ALJ found that Plaintiff could not complete his past relevant work as an IT manager or data technician.  *Id.* at 24.  At step five, the ALJ found that Plaintiff could perform the representative occupations of dishwasher, food service worker, and stock checker.  *Id.* at 25. The ALJ thus concluded that Plaintiff was not disabled.  *Id.* at 26.

## DISCUSSION

Plaintiff claims that the ALJ improperly failed to credit Plaintiff's subjective testimony regarding his fatigue and mental dysfunction.  Plaintiff further argues that the ALJ failed to properly evaluate the opinions of Drs. Dixit and Mann.  The Court will address these alleged errors in turn.

*Plaintiff's Testimony*

The ALJ gave four reasons for disbelieving Plaintiff's testimony about his fatigue and mental limitations: inconsistency with the objective medical evidence in the record, conservative treatment, Plaintiff's activities of daily living, and Plaintiff's collection of unemployment benefits after his onset date.  The Court finds that none of these reasons is supported by substantial evidence.

1. Consistency with Medical Record

14

1    First, the ALJ claimed that "the extent of the medical deficits . . . did not entirely support

2    the extent of [Plaintiff's] allegations[.]"  AR at 20.  The ALJ noted that Plaintiff's "mental status

3    examinations are mostly normal," *id.* at 21, but failed to assess whether the extent of the *abnormal*

4    findings was consistent with Plaintiff's reported symptoms.  Dr. Griffin diagnosed Plaintiff with

5    memory dysfunction based on his "decent but not perfect" showing on "limited direct testing,"

6    indicating that even modest tested deficiencies can signal an underlying problem.  It also bears

7    noting that most of Plaintiff's mental status exams were so-called "mini mental status exams," that

8    Plaintiff's scores on these exams declined over time, and that Plaintiff's results on the longer-form

9    memory exams administered by Dr. Dixit were notably poor.  It was error for the ALJ to discount

10   Plaintiff's cognitive symptom testimony on the grounds that his mental status results were "mostly

11   normal" without accounting for the significance of any abnormal findings.

12   Similarly, the ALJ noted that Plaintiff "did not require intensive or emergent care."  AR at

13   21.  This is true, at least as regards Plaintiff's psychological problems[3], but it is of minimal

14   relevance.  First, Plaintiff's cognitive problems—memory and attention impairments—are not of

15   the kind typically treated in an intensive or emergent setting.  Second, even when Plaintiff's

16   anxiety and depression reached a crisis point and providers feared that he would suffer a psychotic

17   break, they recommended treatment in the community because Plaintiff's conditions were resisting

18   medication and a wider variety of services were available in the less-restrictive setting.  In other

19   words, treatment in the community appears to have been recommended not because Plaintiff's

20   anxiety and depression were mild, but because they were sufficiently severe and difficult to treat

21   that intensive or emergent treatment would have been ineffective.

22   The ALJ also pointed out Plaintiff's normal EEG test results.  However, those results

23   themselves noted that a normal EEG did not rule out the possibility of a seizure disorder, and Dr.

24   Mann opined that Plaintiff's "seizure" symptoms may well be caused by a condition other than

25   epilepsy.  Standing on their own, the normal EEG test results do not contradict Plaintiff's

26   testimony about his condition.

27

28   ³ Plaintiff *was* taken to the emergency room after the 2021 car crash, which was caused by
     epilepsy or fatigue.

1     Finally, when evaluating Plaintiff's testimony about his fatigue, it appears the ALJ applied

2  the wrong standard.  The ALJ's opinion stated that "whenever statements about the intensity,

3  persistence, or functionally limiting effects of pain or other symptoms are not substantiated by

4  objective medical evidence, I must consider other evidence in the record to determine if the

5  claimant's symptoms limit the ability to do work-related activities." AR at 20.  However, the

6  proper standard for evaluating subjective symptoms like pain and fatigue is a much more

7  deferential one: once the claimant presents objective medical evidence of an impairment which

8  could be expected to produce "some degree of the symptom", and absent evidence of malingering,

9  "the ALJ can reject the claimant's testimony about the severity of [the] symptoms only by offering

10  specific, clear and convincing reasons for doing so."  *Ferguson v. O'Malley*, 95 F.4th 1194, 1199

11  (9th Cir. 2024).  The reasons set forth in the ALJ's decision, however, are not convincing (and

12  often not specific or clear) for the reasons described in this Order.

13     Accordingly, substantial evidence does not support the ALJ's determination that Plaintiff's

14  symptom testimony was inconsistent with the medical record.

15                      2.   Conservative Treatment

16     The ALJ also cited what she characterized as Plaintiff's "conservative" course of treatment

17  to discredit Plaintiff's testimony.  However, the record does not contain substantial evidence that

18  Plaintiff's treatment was "conservative."

19     For instance, the ALJ asserted that "as of the consultative examination [by Dr. Dixit,

20  Plaintiff] was not being treated with medication[.]"  AR at 19.   While Dr. Dixit reported Plaintiff

21  as stating in early 2021 that Plaintiff was not taking any medication, the medical records before

22  the Court indicate that Plaintiff *was* taking several medications for his various conditions from

23  2019 to 2022.  The ALJ acknowledged as much later in the decision, stating that Plaintiff's

24  "seizure and depression conditions were managed with medication."  *Id.* at 23.  Indeed, shortly

25  after the Dixit evaluation, Plaintiff told his psychiatrist that he was taking Lexapro and found it

26  helpful.  The isolated hearsay statement of a man alleging cognitive and memory problems does

27  not constitute "substantial evidence" that Plaintiff was not being treated with medication in light

28  of the overwhelming contrary evidence in the record.  To the extent that Plaintiff's statement to

United States District Court
Northern District of California

16

1    Dr. Dixit was more persuasive and reliable than all of the other record evidence, the ALJ failed to

2    explain how.[4]

3          The ALJ noted that Plaintiff had been encouraged to address his depression and anxiety

4    through "psychotherapy and counseling" as opposed to other (presumably less "conservative")

5    treatments.  AR at 19.  However, psychotherapy and counseling are customary and generally

6    accepted treatments for anxiety and depression regardless of severity, not "conservative"

7    treatments reserved only for mild cases.  The Mayo Clinic says that psychotherapy or counseling

8    is one of the "two main treatments for anxiety disorders," the other being medications, which the

9    record indicates Plaintiff was also taking.  *Anxiety disorders – Diagnosis & treatment*, MAYO

10   CLINIC, https://www.mayoclinic.org/diseases-conditions/anxiety/diagnosis-treatment/drc-

11   20350967 (last visited September 4, 2024).  While the Mayo Clinic notes more treatment options

12   for depression, including hospitalization and electroconvulsive therapy, the first two treatments it

13   suggests are medications and psychotherapy.  *Depression (major depressive disorder) – Diagnosis*

14   *& treatment*, MAYO CLINIC, https://www.mayoclinic.org/diseases-

15   conditions/depression/diagnosis-treatment/drc-20356013 (last visited September 4, 2024).  Even

16   some of the more aggressive treatments, like partial hospitalization, rely in part on psychotherapy

17   to produce results.  *Id.*  Finally, as noted *supra*, Plaintiff's treatment providers felt that

18   hospitalization would be *less* effective than treatment within the community.  Therefore, it was

19   error for the ALJ to classify Plaintiff's course of treatment as "conservative" on these grounds.

20         The ALJ stated that the record reflects only "rare occasions when the claimant seeks

21   mental health treatment[.]"  AR at 21.  The Court presumes that the ALJ is referring to

22   psychotherapy or counseling, as Plaintiff appears to have seen a neurologist and psychiatrist on a

23   consistent basis, sought additional mental evaluations as insurance coverage allowed, and

24   generally kept up with his mental health medications.  Even focusing on psychotherapy or

25

26         [4] The ALJ also asserts without elaboration that the medication treatment Plaintiff received

27   was "conservative in nature."  AR at 20.  As there is nothing obviously conservative about
     Plaintiff's course of pharmaceutical treatment (as there might be for, say, a person claiming

28   debilitating pain but taking only aspirin), the Court finds that substantial evidence does not support
     this conclusory statement.

United States District Court
Northern District of California

counseling, an examination of the record indicates that Plaintiff might have avoided such treatment as a result of his anxiety or another paranoia-causing condition.  He stated repeatedly in 2019 that he was having a hard time finding a therapist he could trust, also mentioning that he experienced a "near-global" mistrust of others.  His later application for Social Security benefits revealed paranoid thoughts and fears.  The Ninth Circuit allows an ALJ to consider "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" when evaluating a claimant's credibility, but only when "there are no good reasons for this failure." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 404.1502(a).  Further, the Ninth Circuit has suggested that "resistance . . . attributable to [a claimant's] medical impairment" may constitute a good reason for failing to pursue treatment.  *Id.* at 1114.  The ALJ therefore erred in failing to account for the ways in which Plaintiff's anxiety might have affected his pursuit of psychotherapy or counseling.

Finally, the ALJ asserted that Plaintiff's "seizure and depression conditions were managed with medication[.]"  AR at 23.  However, there is no indication in the record that the medication constituted "conservative treatment" or that more aggressive treatment options were available for these conditions.  Additionally, the record evidence indicates that Plaintiff's medications may contribute to his fatigue and cognitive problems, meaning that even if they effectively "manage" these two specific conditions, they may not be improving Plaintiff's condition as a whole.  Finally, the accurate study of Plaintiff's other conditions required that he stop taking his seizure medication indefinitely, meaning that Plaintiff's seizures could not be "managed with medication" as of the date of the ALJ's decision.

For the foregoing reasons, substantial evidence does not support the ALJ's characterization of Plaintiff's treatment as "conservative."

### 3.  Activities of Daily Living

The ALJ also discounted Plaintiff's credibility based on his activities of daily living.  The ALJ stated that Plaintiff's "ability to shop, walk with others, and do household chores with encouragement does not support the extent of his limitations."  AR at 20.  However, the Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily

United States District Court
Northern District of California

activities . . . does not in any way detract from her credibility as to her overall disability." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (internal citation omitted).  It has noted that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it may be impossible to periodically rest or take medication." *Id.*  The Ninth Circuit only allows the use of daily activities to discount claimant testimony in two circumstances: where the daily activities contradict the claimant's testimony, and where the claimant spends a substantial part of their day performing physical functions which are transferable to a work setting. *Id.*

Here, it is unclear which of the two grounds the ALJ is invoking, but neither ground would be supported by substantial evidence.  None of the activities the ALJ names are inconsistent with Plaintiff's alleged symptoms, especially considering Plaintiff's description of his struggles while performing them: he says that he frequently walks into stores and forgets why he came there, that he cannot go grocery shopping on his own, that he only does a few simple household chores on an infrequent basis (dishes once per day, laundry once per month, and watering plants five days per week), and that he requires encouragement to do those chores.  Further, whether or not the physical functions involved are transferable to a work setting, the record does not reflect that these activities took up a substantial portion of Plaintiff's day.  Therefore, the ALJ erred in using Plaintiff's activities of daily living to discount his testimony.

### 4.   Collecting Unemployment Benefits

Finally, the ALJ discounted Plaintiff's testimony regarding his symptoms because Plaintiff collected unemployment benefits for a time after his alleged onset date, "which means he is alleging disability while certifying to another government agency that he is looking for work[.]" AR at 20.  The only evidence the ALJ cites is Exhibit 8D, *id.* at 232, which reflects that Plaintiff received unemployment insurance payouts but does not mention what, if anything, Plaintiff certified to the state government.  This is a critical omission:

> while receipt of unemployment benefits can undermine a claimant's alleged inability to work full[-]time . . . the record here does not establish whether [Plaintiff] held himself out as available for full-time or part-time work.  Only the former is inconsistent

United States District Court
Northern District of California

1    with his disability allegations.  Thus, such basis for the ALJ's credibility finding is not

2    supported by substantial evidence.

3    *Carmickle v. Commissioner*, 533 F.3d 1155, 1161–62 (9th Cir. 2008).

4        For the foregoing reasons, the ALJ's finding as to Plaintiff's credibility was not supported

5    by substantial evidence.

6        *Dr. Dixit's Evaluation*

7        While the ALJ generally found Dr. Dixit's evaluation persuasive, she did not credit Dr.

8    Dixit's finding that Plaintiff had a "marked limitation" in maintaining pace and persistence for two

9    hours.  The ALJ dismissed this conclusion as "inconsistent with the record as a whole" because it

10   was "not consistent with the State agency psychological consultants' findings" or "with the extent

11   of the claimant's psychological treatment as detailed above."  AR at 20–21.  The Court finds that

12   this purported "inconsistency" is not supported by substantial evidence.

13       First, the ALJ pointed to the state agency's findings, which she described as "supported by

14   a narrative explanation with citations to the medical evidence in support of the findings[.]"  AR at

15   23.  However, as this Court has noted, the state agency's "explanations" as relevant to the denial

16   of benefits were phrased in broad, conclusory language.  And while the state agency did cite and

17   recount the medical evidence, it is generally unclear how the conclusion it reached on Plaintiff's

18   pace and persistence limitation followed from the evidence cited.  Therefore, this Court would not

19   characterize the state agency's findings as adequately "supported."  The ALJ also stated that the

20   state agency's findings "were consistent with the record as a whole, which showed generally

21   conservative management of the claimant's conditions."  *Id.*  However, as explained above, the

22   characterization of Plaintiff's treatment as "conservative" is not supported by substantial evidence.

23   Social Security regulations provide that "supportability… and consistency . . . are the most

24   important factors we consider" when assessing "prior administrative medical findings[.]"  20

25   C.F.R. § 404.1520c(b)(2).  Because neither of these "most important factors" supports the weight

26   the ALJ gave to the portions of the state agency decision that contradict Dr. Dixit's report, it was

27   error to discount Dr. Dixit's opinion on the basis of the state agency's opinion.

28       The ALJ's other reason for discounting Dr. Dixit's marked-limitation assessment was that

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1  such a limitation would be inconsistent with the extent of the claimant's psychological treatment.

2  Putting aside that the ALJ has not articulated sufficient grounds for characterizing Plaintiff's

3  psychological treatment as conservative, it is unclear exactly what further psychological treatment

4  would be expected to increase Plaintiff's pace and persistence, especially since these deficits may

5  well be fueled in part by Plaintiff's fatigue.  Accordingly, substantial evidence does not support an

6  inconsistency between Plaintiff's course of treatment and Dr. Dixit's assessment.

7      For the foregoing reasons, the ALJ erred in discounting Dr. Dixit's assessment of a marked

8  limitation.

9      *Dr. Mann's Opinion*

10     The ALJ did not find any of Dr. Mann's opinions to be persuasive.  AR at 22.  The ALJ

11 noted that Dr. Mann's "statements about the claimant's ability to work and return to work are

12 neither inherently valuable nor persuasive" under 20 C.F.R. 404.1520b(c).  The Court believes this

13 to be an appropriate treatment of such conclusory statements under the cited regulation.  However,

14 the ALJ also claimed that Dr. Mann's "statements about [Plaintiff's] concentration affecting his

15 ability to work and his need to miss more than four days of work per month were not supported by

16 [Dr. Mann's] own records[.]"  AR at 22.  The Court finds that this assertion by the ALJ is not

17 supported by substantial evidence.

18     The only part of Dr. Mann's records the ALJ pointed out as inconsistent with Dr. Mann's

19 conclusions was an entry from September 2021, where "Dr. Mann noted that [Plaintiff's]

20 cognitive problems were likely related to a combination of medication, depression, and untreated

21 sleep apnea, and his seizure and depression conditions were managed with medication[.]"  AR at

22 22–23.  It is unclear how this information is meant to contradict Dr. Mann's assertion about

23 Plaintiff's concentration and need to miss work.  Further, the page of notes the ALJ cites for this

24 proposition (Exhibit 8F, AR at 557) contains no indication that Plaintiff's conditions were

25 "managed" with medication in the sense of their no longer being disabling.  They do show that

26 Plaintiff was *taking* quite a bit of medication and that this was causing problems of its own.  While

27 it appears from Dr. Mann's records that several of Plaintiff's medications were somewhat helpful,

28 these records also indicate that Plaintiff continued to suffer from seizures and cognitive symptoms.

1    Accordingly, substantial evidence does not support the existence of an inconsistency between Dr.

2    Mann's statements.

3         The ALJ also concluded that Dr. Mann's "findings are not consistent with the record as a

4    whole, which showed the claimant would not have difficulty remembering and *focusing on* simple

5    instructions (Exhibit 12F)."  AR at 23 (emphasis added).  But Exhibit 12F, the Dixit report,

6    concluded that "the claimant will have no difficulty remembering and *following* simple

7    instructions."  *Id.* at 517.  This is substantially different: while the ability to "focus on"

8    instructions implies that Plaintiff could concentrate on a task for an extended period of time, the

9    ability to "follow" those instructions carries no such implication.  Therefore, substantial evidence

10   does not support an inconsistency between the concentration findings of Drs. Mann and Dixit.

**DISPOSITION AND INSTRUCTIONS FOR REMAND**

12        IT IS THEREFORE ORDERED that Plaintiff's motion for summary judgment is

13   GRANTED and Defendant's cross-motion for summary judgment is DENIED.  The case is hereby

14   REMANDED for further proceedings consistent with this opinion.

15        On remand, the ALJ is directed to credit as true Plaintiff's subjective complaints of fatigue

16   and Dr. Dixit's assessment of a marked limitation on maintaining pace and persistence for 2 hours.

17   See, e.g., *Aparicio B. v. Commissioner of Social Security*, 2022 WL 799404, at *6 (N.D. Cal.

18   March 16, 2022).  The ALJ is further directed to reevaluate Plaintiff's testimony about his other

19   symptoms and Dr. Mann's findings consistent with the guidance in this opinion.

20        On remand, the ALJ should also develop the record as to Plaintiff's symptoms of paranoia,

21   fictitious memory, and auditory hallucinations.  The record indicates that Plaintiff's psychiatrist

22   believes that Plaintiff suffers from bipolar disorder or schizophrenia, even going so far as to

23   prescribe Plaintiff medications for these conditions, but neither condition was listed as a medically

24   determinable impairment at Step 2.  Development of the record concerning these symptoms and

25   potential diagnoses is particularly important because they may be aggravating his cognitive

26   problems or impeding him from seeking help for his anxiety and depression.

27        The ALJ should reconsider her Step 3 assessment of Plaintiff, which rests on an

28   assessment of Plaintiff's treatment as "conservative" and a comparison with the state agency's

United States District Court
Northern District of California

United States District Court
Northern District of California

opinion, in light of what the Court has said here about the nature of Plaintiff's treatment and the persuasiveness of the state agency's opinion.

The ALJ may also wish to consider developing the record as to Plaintiff's seizures by obtaining testimony from Plaintiff's wife, who has witnessed these spells.  While the ALJ accurately notes that a witness statement from a medical professional is "preferred" by the Social Security Administration, a statement from Plaintiff's wife combined with Plaintiff's and Dr. Mann's testimony as to seizure frequency may nonetheless fulfill the criteria for Listing 11.02.

**IT IS SO ORDERED.**

Dated: September 9, 2024

_____
ROBERT M. ILLMAN
United States Magistrate Judge